# ORIGINAL

UNITED STATES DISTRICT COURT

DISTRICT OF VERMONT

TIMOTHY KEENE                          *
                                       *
        vs                             *  DOCKET NO. 2:07-cv-00079
                                       *                      WKS
DANIEL SCHNEIDER and                   *
JARED HATCH                            *


D E P O S I T I O N

OF

DANIEL SCHNEIDER


Taken on behalf of the Plaintiff
on Monday, July 7, 2008 at the
law offices of Rubin, Kidney, Myer & DeWolfe,
Barre, VT.

APPEARANCES:

MAGGIE K. VINCENT, ESQ., of the firm Rubin, Kidney,
Myer & DeWolfe, 237 N. Main Street, Barre, VT
05641-4125, appeared and represented the Plaintiff.

DAVID R. GROFF, ESQ., of the firm Office of the
Attorney General, 109 State Street, Montpelier, VT,
05609-1001, appeared and represented the
Defendants.

COURT REPORTER:  Virginia L. Simmer, RPR


GREEN MOUNTAIN REPORTERS
P.O. Box 1311
Montpelier, VT 05601
(802) 229-9873  (802) 288-9578
(800) 595-9873

1    Q.   Okay.

2    A.   And then it just says 20:24 hours arrived on

3  scene.   So according to this I don't know exactly

4  where arrived on scene is.   I mean, it doesn't even

5  say scene.   It just case SC.

6    Q.   And you're assuming that's arrived on scene?

7    A.   It looks like according to this possibly at

8  00:24 hours I arrived at Mr. Keene's house if

9  I'm -- if arrived on scene means Mr. Keene's house.

10    Q.   Okay.   Then can you tell from that when you

11  left Mr. Keene's residence?

12    A.   According to this, no, I can't.

13    Q.   Can you tell when he received medical

14  assistance on the road?

15    A.   It says rescue is on scene at 0:49 hours

16  which is now the 16th.

17    Q.   And were you the person who transported Mr.

18  Keene?

19    A.   To which location?

20    Q.   From his residence to the barracks.

21    A.   Yes, I did transport Mr. Keene from Route 2

22  where he received medical attention to the

23  barracks.

24    Q.   Okay.   So are you cruiser 234?

25    A.   That is my call number, yes.

1    you decided to place him under arrest and what

2    happened then?

3      A.   I ordered him to turn around and place his

4    hands behind his back which he refused to do.  And

5    I ordered him several more times to place his hands

6    behind his back which he refused to do.  And then I

7    advised him if he did not comply with my lawful

8    orders I would spray him with my OC which then he

9    again refused to comply with my orders.  I then

10   sprayed him in the face with my OC and then forced

11   him to the ground.

12     Q.   Okay.  And did he -- did Mr. Keene engage in

13   any assaultive behavior toward you?

14     A.   He became defiant, standoff-ish.  I perceived

15   that as a clue that he could become assaultive.

16     Q.   How did he display his defiance?

17     A.   By crossing him arms, changing his tone of

18   voice and telling me no, he was not under his

19   arrest.

20     Q.   Tell me how he crossed his arms?

21     A.   Across his chest like this.

22     Q.   So you just crossed your arms across your

23   chest?

24     A.   Yes, ma'am.

25     Q.   And you regard that as preliminary

1    Q.  And you'll agree in that time we heard

2  basically eight words from Mr. Keene?

3    A.  I don't know.  I can't recall how many words

4  he said.

5    Q.  For what, he said for what twice in response

6  to your arresting him, did you hear that?

7    A.  Yes.

8    Q.  He said no three times?

9    A.  Once again, I don't know how many times he

10 said no.

11   Q.  He said what's OC?

12   A.  Yes.

13   Q.  And he said yes?

14   A.  Yes.

15   Q.  But you heard defiance in there?

16   A.  From the beginning of how I was interacting

17 with him to that point in time at the time I

18 believed it was becoming defiant, him changing his

19 tone of voice.

20   Q.  Okay.  So would you agree that he sounds

21 pretty quiet on that video?

22   A.  I mean, I can hear him.  I wouldn't say he's

23 yelling at me, no.

24   Q.  He's not yelling.  You're speaking in a

25 fairly firm tone of voice?

1   A.  Yes.

2   Q.  He isn't even matching your volume, he's

3   softer than you are, right?

4   A.  I don't know about that.  My body mic is

5   right here on my chest.

6   Q.  Okay.  Did you hear any forceful kinds of

7   words from him in there?

8   A.  No.  And then after the whole incident he

9   started cursing at me.

10  Q.  I'm sure we'll get to that but I'm talking

11  about those moments when you first chose to arrest

12  him and spray the OC.  So I'm talking about that

13  portion of time.  And you said that he was defiant

14  and he was not complying with putting his hands

15  behind his back?

16  A.  Yes.

17  Q.  And that you took that defines to mean that

18  he could become assaultive?

19  A.  Yup, yes.

20  Q.  And your indicators again that he could

21  become assaultive were that he placed his arms

22  across his chest?

23  A.  Yes.

24  Q.  Which most people would regard more as a

25  protective gesture, wouldn't they?

1    that is an unusual statement on my part, for me.

2       Q.   Okay.  When you first said you're under

3    arrest and he said for what?

4       A.   And I explained it to him and then he said

5    no, I'm not or something to that effect.

6       Q.   Okay.  And in that small segment that we

7    heard you did not hear him speaking at a high

8    volume?

9       A.   According to the tape, no.

10      Q.   Would you say that those words sound more

11   passive than anything else?

12      A.   No.

13      Q.   Okay.  I'm going to play the part that comes

14   immediately after and ask you to count specifically

15   the blows that you can hear on the tape, okay?

16      A.   Once again I would not know how many times.

17      Q.   I'm going to ask you if you can count the

18   blows you can hear, okay.

19                    (Tape played)

20   BY MS. VINCENT:

21      Q.   So were you able to count blows?

22      A.   Maybe 14.

23      Q.   I know that you'd said in some of your prior

24   statements, some of your prior reports that you

25   lost count but on there you heard maybe 14 blows?

1    A.   Maybe.   Like I said, there's no video so I

2    don't exactly know exactly.   I count the exertion

3    of me going "ah" as a possible me striking him.

4    Q.   So that is you that we hear on there making

5    the "ah" sound as you said?

6    A.   Yes.

7    Q.   And can you attribute any of those blows to

8    Trooper Hatch?

9    A.   At this point, no, I can't.   I don't know.

10   Q.   Did you hear Trooper Hatch at all on that

11   video?

12   A.   Yes.

13   Q.   What did you hear him saying?

14   A.   I can't recall right now.   I was paying

15   attention to what you asked, that question.

16   Q.   So you heard his presence?

17   A.   Yes.

18   Q.   But you can't specifically attribute any of

19   the blows to him?

20   A.   No, I don't know.

21   Q.   Because it was your mic that was picking up

22   this interaction is it likely that the all 14 blows

23   that you heard were attributable to you?

24   A.   Possibility.

25   Q.   And you were winded there, right?

1    A.  Yes.

2    Q.  Do you remember just kind of on an exertion

3    level how much force you expended in those two

4    minutes that those 14 blows that you heard were

5    being struck?

6    A.  I was tired.

7    Q.  Okay.  And from the time -- let's go back to

8    when you sprayed Mr. Keene with the OC.  You

9    thought you were alone in the house, right?

10   A.  Well, I believed I was alone at his

11   residence, unsure if it was just me and Mr. Keene

12   in his residence.  I was unsure of that.

13   Q.  So you hadn't previously called for any kind

14   of backup assistance or anything like that?

15   A.  I don't recall.

16   Q.  Was it a surprise to you that Trooper Hatch

17   was there?

18   A.  At that point when he came in, yes.

19   Q.  You just hadn't been aware that he was on the

20   way or anything like that?

21   A.  I don't recall.  At the point when I was

22   speaking with Mr. Keene inside his residence I

23   believed I was the only trooper there at the

24   residence.

25   Q.  And when you pulled up to his residence

1    Trooper Hatch was not with you?

2       A.   No.

3       Q.   He wasn't sitting out in the driveway in a

4    different cruiser?

5       A.   No.

6       Q.   Okay.  And so you sprayed him with the OC?

7       A.   Yes.

8       Q.   And what was your next action?

9       A.   I applied an arm bar, modified arm bar and

10   forced him to the ground.

11      Q.   On the way to the ground did he hit anything?

12      A.   Yes.

13      Q.   What?

14      A.   The front door or the door I entered in.

15      Q.   Did he wind up face down on the floor?

16      A.   Yes.

17      Q.   And that was in the entryway?

18      A.   Pretty much directly in front of the door.

19      Q.   It's a little tiled area?

20      A.   I don't recall.

21      Q.   You don't recall flagstones right there by

22   the door --

23      A.   I don't recall.

24      Q.   -- that his face would have been in the

25   flagstones, you don't remember that?

1     A.   I don't recall what type of flooring it was.

2     Q.   Okay.  If he went down in front of the door

3  was the door open?

4     A.   My best recollection was that it was closed.

5     Q.   Okay.  So what was -- on Mr. Keene going to

6  the floor what position did he assume, what

7  position was he in?

8     A.   He was lying on his stomach with his arms

9  tucked underneath his chest.

10    Q.   And on the way to the ground did he strike at

11 you in any way?

12    A.   No.

13    Q.   And while he was on the ground did he strike

14 at you with his hands?

15    A.   No.

16    Q.   Did he kick at you?

17    A.   I don't recall.

18    Q.   Did he just stay in kind of a possum position

19 with his arms under him?

20    A.   He stayed on his stomach with and forcing his

21 arms underneath him.

22    Q.   So he wouldn't release his arms?

23    A.   Yes.

24    Q.   But he wasn't striking you, he wasn't harming

25 you in any way?

1     A.   He was not striking me, no.

2     Q.   Was he harming you in any way?

3     A.   Not at that point, no.

4     Q.   Is that a position from which you have any

5   fear that someone will physically harm you?

6     A.   Yes.

7     Q.   When someone's lying on their stomach on

8   their arms?

9     A.   Potential, a lot of things could happen.

10    Q.   So what is the potential when someone is

11  lying -- having just been OC's so I'm assuming

12  their vision isn't very good, when someone has just

13  had OC spray applied and their face is into the

14  ground and their arms are under them what is it you

15  specifically fear?

16    A.   Them continuing to resist.  I do not know

17  what type of weap -- even if Mr. Keene had a weapon

18  he could access stuff into his belt, his pockets,

19  he could try to roll into me.  There's numerous

20  possibilities.

21    Q.   And was it when he first on the ground that

22  you became aware of Trooper Hatch's presence?

23    A.   When I became aware of Trooper Hatch's

24  presence was when he came inside.

25    Q.   But I guess where in what we've just been

1    is on the floor.  Where were you in relation to his

2    head?

3        A.  Are you familiar with his house?

4        Q.  Yes.

5        A.  I was -- my back was facing the stairs and I

6    was facing the door.

7        Q.  Okay.  So your back -- so in relation to his

8    body on the floor was it --

9        A.  I believe it would be his right side.

10       Q.  Okay.  Was Trooper Hatch on the left?

11       A.  He was next to the door and I believe it

12   would be on the left side.

13       Q.  Okay.  So one officer on either side?

14       A.  Yes.

15       Q.  Okay.  And who was -- was one of you working

16   on Mr. Keene's arms more than the other?

17       A.  I don't recall.  I would try to access an

18   arm, he refused and then I would go to some type of

19   strikes and then try to gain an arm again.

20       Q.  Did you believe that Mr. Keene was in some

21   altered state that he wasn't feeling the blows?

22       A.  I believed he was intoxicated.  I am unsure

23   if he felt the blows or not.

24       Q.  Okay.  He didn't give you any indication that

25   he was in pain from what was going on?

1    A.   From the tape --

2    Q.   Or from your recall.

3    A.   I don't really think he was feeling them at

4  that point.  He still refused to comply with my

5  orders so I believe the strikes were ineffective.

6    Q.   So refusal to surrender his arms means to you

7  that he didn't feel the blows?

8    A.   They were ineffective.

9    Q.   Okay.  So the strikes that you were doing

10 which were again -- I'm sorry, would you back up

11 and describe what kind of strikes you were applying

12 to him?

13   A.   I applied knee strikes, closed fist strikes

14 and then I stated elbow strikes but they're more of

15 a forearm strike instead of a straight elbow

16 strike.

17   Q.   And those were ineffective?

18   A.   Yes, ma'am, in my opinion.

19   Q.   We kind of heard maybe three or four

20 different volleys, you know, kind of there will be

21 strike, strike, strike, strike, stop, Mr. Keene

22 saying "I've got a daughter upstairs," then, you

23 know, starting again.  In between the kind of

24 volleys of your assault on him was that when you

25 were trying to get his arms?

1              MR. GROFF:  Object to the form.  Go

2         ahead and answer.

3     A.  I'd assume it was I would give him some type

4  of strike and then try to regain an arm.

5     Q.  Okay.  So you think it was like one strike,

6  try to get an arm, another strike, try to get an

7  arm?

8     A.  I'd say I let -- I would apply a few

9  strikes -- I don't know, I mean, it changed.  I

10  heard a strike and then a pause and then a couple

11  strikes and a pause and then some more strikes and

12  a pause.  I don't exactly know if I struck him once

13  and then tried to or struck him three times and try

14  to apply.

15     Q.  But eventually after 14 or so blows you did

16  decide that was ineffective?

17     A.  Yes.

18     Q.  And then what did you do?

19     A.  I applied a pressure point.

20     Q.  Why didn't you apply a pressure point up

21  front?

22     A.  I didn't think about it.

23     Q.  Was the pressure point effective?

24     A.  It was effective enough so I could gain an

25  arm.

1    Q.   So how did you apply the pressure point?

2    A.   According to my memory I had to try it twice,

3    once was with my fingertips, my index fingertips,

4    sorry.  I applied pressure; it was ineffective.

5    Q.   Where did you apply the pressure?

6    A.   It's called a mandibular angular pressure

7    point.  It is in the soft portion behind your ear

8    lobe on both sides.  First applied it it was

9    ineffective and then I believe I applied it again

10   with my thumb tips.

11   Q.   Okay.  And?

12   A.   And I observed his right arm to partially

13   come out enough so I could obtain his bicep and

14   then I was able to get him into a shoulder lock.

15   Q.   Okay.  And the shoulder lock -- by using the

16   shoulder lock were you able to get his other arm?

17   A.   Yes, I had applied pressure to that for him

18   to release his other arm so we could put it in the

19   small of his back.

20   Q.   Okay.  And then you got him handcuffed?

21   A.   Yes, ma'am.

22   Q.   What was Trooper Hatch doing while you were

23   doing all this?

24   A.   I believe he applied a few knee strikes like

25   I said to his lower half, to his small of his lower

1  back, the thigh area or love handle area and he was

2  continually trying to pull his arm, his left arm

3  free.  And he was giving him verbal commands to

4  stop resisting also I believe.

5     Q.  And you heard him thereafter maybe the third

6  blow saying "I have a daughter upstairs"?

7     A.  At a point in time he stated that on the

8  tape, yes.

9     Q.  And did you have any reaction or response to

10  that?

11     A.  I think I said "Please stay upstairs."

12     Q.  Okay.  And then you heard his daughter kind

13  of crying and saying "Stop"?

14     A.  Either when she made her presence known or

15  when he said that I said "Please stay upstairs"

16  when I became aware that somebody was upstairs.

17     Q.  Okay.  And let's go back.  At some point your

18  microphone which has been on through this whole

19  thing you actually turned it off, right?

20     A.  Yes, ma'am.

21     Q.  And why did you do that?

22     A.  So I could have a private conversation with

23  Trooper Hatch.

24     Q.  Why did you need a private conversation with

25  Trooper Hatch?

1    Q.   Okay.  And you'd say that there was a smell

2  of fecal matter.  Meaning that from a smell the two

3  of you thought that Mr. Keene had expelled some

4  fecal matter in his interaction with you?

5    A.   Well, I advised Trooper Hatch that he smelled

6  of fecal matter.  I don't know if he did that while

7  or before, I'm not too sure.

8    Q.   Okay.  When you went into his residence did

9  you notice that smell?

10    A.   No.

11    Q.   When you were standing there before you

12  applied the OC did you smell any fecal matter?

13    A.   No.

14    Q.   So if you didn't smell it when you were

15  asking him to put his hands behind his back but you

16  did smell it after the struggle, do you think that

17  he expelled some fecal matter during his

18  interaction with you?

19    A.   Could have been.

20    Q.   Likely?

21    A.   Likely.

22    Q.   And do you think the cause would have been

23  the blows that you directed to his abdomen or you

24  said his love handles?

25    A.   I couldn't call.  I would not know what would

1   have caused him to have that incident occur.

2      Q.   Okay.  And you described the situation with

3   Mr. Keene as a struggle in at least some of your

4   Affidavits.  Did he ever struggle?

5      A.   He resisted.

6      Q.   By holding his arms under him?

7      A.   Yes.

8      Q.   And by lying very still and holding his arms

9   very close under him?

10     A.   And not complying with my lawful orders.

11     Q.   Right but not by flailing around and trying

12  to hit you or anything like that?

13     A.   No.

14     Q.   Okay.  Is it unusual to call a patrol

15  commander or a supervisory officer from the road?

16     A.   Is it unusual?

17     Q.   Ah-huh.

18     A.   No.

19     Q.   And based on your training what is allowed in

20  a circumstance where someone is passively resisting

21  arrest?

22     A.   Passively?

23     Q.   Passively, not assaulting you, passively

24  resisting arrest.

25     A.   In my view he was actively resisting, he was

1    A.   I would say distraction and softening so he

2    would lessen his hold on his arms.

3    Q.   Okay.  Were you subject to any disciplinary

4    action with regard to this incident?

5    A.   No.

6    Q.   And were you subject to any disciplinary

7    review?

8    A.   No.

9    Q.   But your actions were reviewed by a

10   supervising officer?

11   A.   Yes.

12   Q.   And what did that review consist of?

13   A.   My use of force.

14   Q.   But what was the review process?

15   A.   I submitted my use of force to the sergeant,

16   he reviewed it and then my best recollection of

17   what occurs is the lieutenant for the station

18   command reviews it and then I believe it goes up

19   from there.  I'm not really too sure on the exact

20   process of it.

21   Q.   Okay.  But that's the chain of review?

22   A.   Yes, ma'am.

23   Q.   I just want to find one more portion of the

24   tape.  Do you know how long it took before Mr.

25   Keene had any kind of medical attention for his

1    eyes?

2      A.   Unsure.

3      Q.   Decontamination for eyes, was that done by

4    you?

5      A.   No.

6      Q.   Who was it done by?

7      A.   By the EMS that arrived on scene.

8      Q.   And when the OC was applied right in his home

9    and there's a faucet right there was it unusual to

10   wait until minutes later for a professional to get

11   the OC off him on the roadside rather than just

12   using a faucet?

13     A.   I'd say I wouldn't feel safe trying to

14   decontaminate somebody in their home.  I would

15   rather have an ambulance show him up, get him out

16   of that situation.

17     Q.   So you're saying that's not unusual?

18     A.   I've never done it.

19     Q.   So you've got someone handcuffed, you've got

20   two troopers there and a 14-year-old girl?

21     A.   That we know of.

22     Q.   And you didn't just use the faucet to

23   decontaminate him?

24     A.   No.

25     Q.   If it was 10, 15 minutes later is it unusual

1   potentially under assault that whole time -- under

2   threat of assault that whole time?

3       A.  Well, I felt uncomfortable.  He's becoming

4   from our conversation with the Bonnie Breer he was

5   more apt of talking to me, then I started

6   questioning him about his drinking and he started

7   not being so cooperative with the, you know,

8   questioning.

9       Q.  Okay.  Let's play those next three minutes.

10                      (Tape played)

11  BY MS. VINCENT:

12      Q.  So you're reacting to him saying "Shut the

13  fucking light off, get it off my eyes"?

14      A.  Well, in my opinion it doesn't have to -- he

15  changed his attitude when I started questioning

16  him.  I tried to lighten up the subject, talk to

17  him a little bit more and then go back at it.

18      Q.  But prior to that he had asked you to stop

19  flashing the flashlight in his eyes and he didn't

20  use the word fucking then, he just said will you

21  stop using the flashlight?

22      A.  Well, I had my flashlight on apparently.

23      Q.  And then a minute later you've got the

24  flashlight in his eyes again and he reacts more

25  strongly because --

1   A.  I don't know if I explained why I wanted -- I

2   think maybe the second time I explained why I

3   wanted him to step outside.

4   Q.  And then he said no more firmly the second

5   time, would you agree with that?

6   A.  I was really not paying attention --

7   Q.  Okay, let's listen.

8   A.  -- to that portion.

9                   (Tape played)

10  BY MS. VINCENT:

11  Q.  You've just twice asked him to step outside

12  with you and he said "No, I don't want to step

13  outside with you"?

14  A.  Yes.

15  Q.  And the first time was fairly soft, the

16  second time more firm?  You didn't hear that?

17  A.  I'd say it was, you know, a little bit

18  louder.

19  Q.  And you didn't explain either time -- if your

20  purpose was to go outside for field sobriety

21  exercises, you didn't explain that either time?

22  A.  Not at that point, no.

23  Q.  No, okay.

24                  (Tape played)

25  BY MS. VINCENT:

Daniel Schneider
7-7-2008
Page 51

1    Q.  So that's the whole interaction at his house

2   now, right, that you've heard the whole thing?

3    A.  Yes.

4    Q.  Other than the fact that he doesn't seem to

5   understand why you're interested in the fact that

6   he's drinking you point out the beer cans, in fact,

7   by his chair, you say is it those, the Natty Ices,

8   is that you?

9    A.  Not by the chair.  It was by the stairs.

10    Q.  Okay.  But other than his wondering why

11   you're interested in his drinking and other than

12   his saying no, I don't want to go outside with you

13   was he doing anything that was in any way violent,

14   assaultive, even loud?

15    A.  Well, he started to get agitated about the

16   flashlight.

17    Q.  Sure.  The second time, as we said, the

18   second time evidently you flashed it in his eyes he

19   did react with some profanity, right?

20          MR. GROFF:  Object to the form.

21  BY MS. VINCENT:

22    Q.  The second time that he made a request that

23   you not flash your flashlight in his eyes did he

24   use profanity?

25    A.  Yes.